IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONNELL WALKER,

    Petitioner,

    v.

BRIAN FROSH, ATTORNEY GENERAL
 OF THE STATE OF MARYLAND,
CLEVELAND FRIDAY, WARDEN OF
 JESSUP CORRECTIONAL INSTITUTION,

    Respondents.

Civil Action No.:  ELH-21-576

**MEMORANDUM OPINION**

Donnell Walker, the self-represented petitioner, filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254.  ECF 1 (the "Petition").  He also included an exhibit.  Respondents have filed an Answer (ECF 6), along with multiple exhibits consisting of hundreds of pages.  They ask this Court to dismiss the Petition and deny relief, claiming that the single claim raised is without merit.  ECF 6.  Walker filed a reply in support of his Petition.  ECF 9.

No hearing is necessary.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2021); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)).  For the reasons that follow, the Petition shall be dismissed and a certificate of appealability shall not issue.

## I.      Background

Walker was charged in the Circuit Court for Baltimore City with first degree murder and use of a firearm in the commission of a felony or crime of violence in connection with the shooting death of Victor Gwaltney on March 25, 2015.  He was also charged with first degree assault, second degree assault, and reckless endangerment in connection with the non-fatal abdominal

gunshot wound to Corey Staley during the same incident.  In an unreported opinion issued by the

Maryland Court of Special Appeals on July 18, 2017 (ECF 6-1 at 135-152), that court said, *id.* at

136-38:[1]

> At approximately 1:00 p.m. on March 25, 2015, Philip Coleman was "foraging" for cans and other pieces of metal near the 4100 block of 10th Street in Baltimore. As Coleman approached 10th Street, he observed a man whom he recognized as appellant standing near a tree. Coleman initially thought appellant was urinating, but upon "focusing," saw that appellant was holding a silver revolver. Coleman approached appellant and told him to put the gun away, to which appellant responded, "Hey, Pop, how you doing?" Appellant then mounted a bicycle and pedaled away from Coleman on 10th Street toward a group of people. Coleman returned to his foraging, but soon heard a "pop." Turning to the sound, Coleman observed appellant firing at the group of people. Coleman watched a man from the group, later identified as Gwaltney, fall to the ground as appellant continued to shoot at him. Appellant then "fumbled" with the gun before firing into a group of fleeing bystanders. Coleman heard someone from the crowd scream that he had been shot.[2] Later that day, Coleman identified appellant in a photographic array as the shooter.

> Frances Ranwick, a resident of nearby Mariban Court, also witnessed the shooting while standing outside of her house. Like Coleman, Ranwick saw appellant standing near a tree prior to the shooting and thought he was urinating. Ranwick then observed appellant pedal a bicycle toward a group of people, leap off the bicycle, and shoot a person in the head. When the man fell, appellant stood over him and continued to shoot him. Appellant ran past Ranwick as he fled the scene. Ranwick also identified appellant as the shooter in a photographic array.

> Police officers responded to the scene, and the two shooting victims were transported to the hospital. Gwaltney was pronounced dead the next day; Staley sustained a non-fatal injury to his abdomen. Dr. Jack Titus, an expert qualified in forensic pathology, performed an autopsy on Gwaltney. Dr. Titus determined that Gwaltney was shot six times and that some of the wounds exhibited signs of stippling, signifying that the shooter fired from close range.

> Pursuant to the police investigation, Thomas Hebert, an expert qualified in DNA analysis, analyzed swabs taken from the handlebars of a bicycle recovered from the scene.  As to the right handlebar, Hebert concluded that there were at least four contributors to the DNA evidence, but he could not make any

---

[1]  The electronic pagination, as cited by the Court in this opinion, does not always correspond to the page number imprinted on an exhibit.

[2] Corey Staley was the second person who was shot.

comparisons to any known samples. On the left handlebar, however, Hebert determined that there was one major contributor and two minor contributors to the DNA profile. Hebert concluded with 99.9% accuracy that appellant was the major contributor to the DNA profile on the left handlebar of the recovered bicycle.

Walker's trial counsel presented an alibi defense. During counsel's opening statement he asserted that Corey Staley would be testifying for the defense and, in doing so, would exonerate Walker. Counsel admonished the jury to listen carefully to each witness, including those testifying for the defense. ECF 6-3 at 29. He continued, *id.*:

> [O]ne of them is going to be the man, Mr. Corey Staley, who is standing there supposedly after the poor fellow Mr. Gwaltney is killed. Mr. Staley is going to be standing there to say, "I saw the fellow shoot me and he didn't look like my friend. I know my friend. He didn't look anything like him." If anybody at all, he would be able to say who the shooter is. For heaven's sakes, this is the guy that got shot and survived. It's a strange case. This is a strange case.

However, Mr. Staley did not testify. Rather, the alibi witnesses for the defense consisted of Walker's sister, Blair Walker ("Blair"), and their mother, Tina Walker ("Ms. Walker"). ECF 6-4 (Trial Tr., 7/28/16) at 166-97, 198-234.

Blair testified that on March 25, 2015, the day of the shooting, she was at home, sitting in the living room of the house in which she lived with her mother; Donnell Walker; her stepsister, Kantira Johnson; and her sister, Denia Walker. *Id.* at 168, 211. She received a phone call reporting that her brother had been shot. *Id.* at 170. So, she went into Donnell's room to check on him, and found him sitting in his room. *Id.* She claimed that her brother, *i.e.*, the defendant, had been in the house since the night before and that he left his room only once, to let out the dog. *Id.* at 170-71. When called upon to provide additional details that she remembered about that day, Blair could not recall anything other than the time of the phone call she received and the timing of her brother's interaction with the dog. *Id.* at 174-94.

Ms. Walker, the mother of the defendant, testified that she learned about Mr. Gwaltney being shot when she was driving home from work and saw a police car going down Tenth Street. ECF 6-4 at 201.  When she drove in the direction of the police car, she saw a body on the ground and asked someone who it was.  *Id*. at 201-02, 208.  Someone told Ms. Walker that Victor Gwaltney was the victim, and she then "jumped out" of her car and ran over to the area, "screaming" for someone to help Mr. Gwaltney because he was like a son to her.  *Id*. at 201-02. Ms. Walker then ran over to her house and went directly to Donnell's room, where she found him wearing only boxer shorts or basketball shorts.  *Id*. at 202, 203.  She claimed her son became very emotional when she told him who had been shot.  *Id*. at 202.  During cross-examination, Ms. Walker confirmed that Donnell never went to the scene of the shooting to check on his friend.  *Id*. at 209, 211, 212.  And, she contradicted her daughter's testimony as to the defendant's whereabouts at the relevant time.  This is because she said she had driven her son to the light rail stop that morning so that he could go to school.  *Id*. at 219.

Defense counsel called Corey Staley to the stand, but he was not at the courthouse.  ECF 6-4 at 235.  After defense counsel advised the court that Mr. Staley was stuck in traffic, the court took a recess from 3:33 p.m. to 3:48 p.m.  *Id*. at 235, 238.  When the trial resumed, defense counsel called Detective Dallessandro.  *Id*. at 240-49.  After the detective's testimony was completed, counsel again called Mr. Staley to the stand.  *Id*. at 249.  When it was clear that Mr. Staley was not yet in the courthouse, the court told counsel:  "And it is now 4:12.  Uh, you can have until 4:15 [to produce Staley.]"  *Id*. at 254.  When Mr. Staley was again called the following took place, *id*. at 255-57:

> THE COURT: Calling Corey Staley. You may shout out one more time in the hallway. Officer, please shout out one more time in the hallway, Corey Staley, Corey Staley. It is now 4:19. At 3:29 this afternoon, we called Corey Staley for the first time.  He was not present.  I was surprised by counsel of his

understanding that his witness was perhaps 30 minutes away. Through successive stalls and breaks, uh afforded every reasonable opportunity for the defense to secure the presence of Corey Staley, a name that's not unfamiliar to the Court and to the jury. At 4:05, we were advised that he was at the front door. It is now uh, pretty close to 4:20 and uh, the Court's patience and allowance given the time of day and the availability of the jury is depleted. Um, Corey Staley has been called one more time. Has not responded to the call. Are there any further proofs to be offered by the defense?

[DEFENSE COUNSEL]: Your Honor, uh, I can only say I've been relaying the information that's been relayed to me.

THE COURT: Are there any further proofs to be offered?

[DEFENSE COUNSEL]: Other than the testimony of Corey Staley, a material witness from both perspectives

THE COURT: Does the defense rest?

[DEFENSE COUNSEL]: That would be the case with that

THE COURT: Thank you. Is there any rebuttal to be offered?

[PROSECUTOR]: No, Your Honor.

THE COURT: That completes the presentation of evidence in this case. Uh, given the lateness of the hour, we will adjourn for the day and return tomorrow and beginning upon your arrival at 8:45 in the morning. . . .

After the jury was excused and the court was reviewing proposed jury instructions with counsel, Mr. Staley arrived.  *Id*. at 264.  Defense counsel asked the court to consider allowing Mr. Staley to testify the following day.  The following colloquy ensued, *id*. at 271-72:

[DEFENSE COUNSEL]:  Your Honor, in the event that Mr. Staley happens to be present at 9:00 a.m. tomorrow, the defense would not at all oppose the Court permitting the defense to call Mr. Staley as a witness.  Invites the Court to consider that.

THE COURT: I'll need some authority for that and I'm sure that if you find any authority for that you'll share it by email with me and with Mr. Dunty.

[PROSECUTOR]: Thank you.

The next morning the court inquired about defense counsel's plans regarding Mr. Staley.

The following exchange is pertinent, ECF 6-5 (Trial Tr., 7/29/16) at 3-4:

> THE COURT: This is the matter of State of Maryland v. Donnell Walker, case numbers 115126012 and 013. Mr. Dunty, Mr. Curran are here with Mr. Walker. Is there a motion to uh, um address the uh presentation of Mr. Staley?
>
> [DEFENSE COUNSEL]: There is not at this juncture, Your Honor. He is as present today as he was at the appropriate time yesterday. In other words, not. We will submit on that.
>
> THE COURT: And I wanted to note for the record because I don't think it was clear, but I excused the uh, uh, essentially uh, uh excused the jury between 4:20 and 4:25 yesterday without Mr. Staley having appeared. But while we were reviewing the jury instructions and before our recess for the day outside of the presence of the jury, before our recess at 4:50, Mr. Staley did arrive. Um, and I had said something to the affect [sic] of, if you were expecting, if Mr. Curran was expecting to uh, uh pursue the presentation of Mr. Staley, uh, uh that I was, uh, I'd be anxious to receive whatever he wanted to send to me by email with a copy to Mr. Dunty, of course. But I didn't receive anything by email. Uh, I did do so [SIC] research. I was prepared to address any motion or uh, uh –
>
> [DEFENSE COUNSEL]: We thank the Court, but the matter became somewhat moot.

After the jury deliberated for approximately five hours, it sent out a note indicating that the jurors were deadlocked and could not reach a verdict.  ECF 6-6 (Trial Tr., 8/1/16), at 3-7.  The court instructed the jury to continue deliberating, and thereafter the jury returned a verdict of guilty as to the first-degree murder of Victor Gwaltney; use of a handgun in the commission of a felony; and the reckless endangerment of Corey Staley.  *Id*. at 10-11.  However, the jury found Walker not guilty of first and second-degree assault charges in connection with the shooting of Mr. Staley.  *Id*. at 11.  As to the murder charge, Walker was sentenced to a term of life imprisonment, with all but 50 years suspended, and concurrent terms of fifteen years for use of a firearm in a crime of violence and five years for reckless endangerment.  *See* ECF 6-7 (sentencing transcript, 10/4/16), at 38.

Walker appealed his conviction to the Maryland Court of Special Appeals, raising three claims of error.  ECF 6-1 at 42 (Brief of Appellant).  Walker argued that the trial court erred when it "failed to allow a continuance or to issue process" to allow for Corey Staley's testimony when he was *en route* to testify for the defense; it allowed a police officer to testify about the function and capability of a revolver when the officer was not qualified as an expert; and it accepted inconsistent verdicts in connection with the charges relating to Mr. Staley.  *Id.* at 42.

In an unpublished opinion dated July 18, 2017, the Maryland Court of Special Appeals determined that the claim regarding Mr. Staley was not preserved for review, as Walker's trial counsel never requested the relief Walker claimed the trial court should have granted.  ECF 6-1 at 142-43.  The court explained: "[W]e ordinarily review a trial court's decision as to the calling of witnesses for abuse of discretion."  ECF 6-1 at 142.  But, the court said that it "cannot determine whether the trial court abused its discretion because [Walker] never requested the relief he claims the trial court failed to grant."  *Id.*  Specifically, Walker's counsel did not request a continuance or subpoena to insure Mr. Staley's presence the following day.  *Id.* at 143.  The court otherwise found no error by the trial court and affirmed Walker's conviction.  *Id.* at 139, 144, 149-50.  The mandate issued on August 21, 2017.  *Id.* at 153.  Walker did not seek certiorari review in the Maryland Court of Appeals.

On May 4, 2018, Walker filed a petition for post-conviction relief.  ECF 6-1 at 154-67.  In his pro se petition, Walker claimed, ECF 6-1 at 157-58:

> Counsel's performance was ineffective when he, (1) failed to issue a subpoena for his clients [sic] alibi witness, (2) failed to request a continuance once that witness arrived late. The previous two errors compromised petitioner's fundamental right to 'secure' and present a defense and the failure to permit the defense to offer such testimony is neither strategic nor reasonable.  Counsel also, (3) failed to properly investigate what impact that potential alibi witness would have on petitioner's trial before promising his testimony to the jury, (4) failed to consult a medical expert in order to impeach the eyesight of a prosecutor['s] eye

witness who admitted to having glaucoma, lastly, (5) the cumulative effect of these errors will also be in question in this petition.

In an amended petition filed by counsel for Walker, a claim was added that trial counsel rendered ineffective assistance of counsel when he failed to secure Mr. Staley as a witness after essentially promising the jury in his opening statement that Mr. Staley would testify. ECF 6-1 at 188-89. At the post-conviction hearing, argument and presentation of evidence was focused on the claim regarding counsel's promise during his opening statement to produce Mr. Staley as a witness. ECF 6-8 at 16.

The post-conviction court denied relief.[3] It found that trial counsel's failure to call Staley as a witness was a "strategic decision in the heat of trial, deserving of the court's deference." ECF 6-1 at 212. Further, the post-conviction court said, *id.* (citation to the record omitted):

> Additionally, if Mr. Staley would have been called at trial and testified to the effect that Petitioner did not shoot him, the State would have entered into evidence Mr. Staley's March 25, 2015 statement to Baltimore Police Detectives that he did not see who shot him.
>
> > DET. DALLESANDRO: Who was standing there shooting [the victim]?
> >
> > MR. STALEY: I couldn't see. I didn't even see which way it came from.
> >
> > MR. STALEY: ... When I looked up, all I see was [the victim] dropping. ...
> >
> > MR. STALEY: ... Who knows, but I wasn't paying attention. So, it could have been anybody...
> >
> > MR. STALEY: I didn't see who shot me.
> >
> > MR. STALEY: ... Let me answer your question the correct way. If I would've seen the guy that shot me, I probably wouldn't say it, but this time, I'm being honest, and I really didn't see the person that was

---

[3] The post-conviction judge was not the trial judge.

> shooting. Maybe if I would've looked up a little earlier, but, like I told him, I was more focused on the YouTube video...
>
> As a result, had Corey Staley testified as proffered by trial counsel in his opening statement, Mr. Staley would have been impeached by his prior inconsistent statement.

Thus, the court said that, even if Staley had testified as proffered by defense counsel, he would have been impeached by his prior inconsistent statements. *Id.* Therefore, in the court's view, Walker failed to satisfy the criteria for ineffective assistance of counsel. *Id.* at 212-13.

Walker's application for leave to appeal the denial of post-conviction relief was summarily denied by the Maryland Court of Special Appeals on February 8, 2021. ECF 6-1 at 224-26. On March 5, 2021, Walker filed his petition for writ of habeas corpus with this court, raising a claim of ineffective assistance of trial counsel in connection with counsel's opening statement promising Corey Staley would testify for the defense. ECF 1 at 2-4.[4]

Additional facts are included, *infra*.

## II.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996, a federal court may "entertain" a petition for a writ of habeas corpus from an inmate in State custody only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 1 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Walters v. Martin*, ___ F. 4th ___, 2021 WL 5365095, at *6 (4th Cir. Nov. 18, 2021). The federal habeas statute sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The Fourth Circuit explained in *Larry v. Branker*, 552 F.3d 356, 368 (4th Cir. 2009): "[I]t is not the province of a federal habeas court to

---

[4] Details regarding the post-conviction court's reasoning and Walker's claim are discussed below.

reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."

"The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems . . . not to apply *de novo* review of factual findings and to substitute its own opinions for the determinations made on the scene by the trial judge." *Davis v. Ayala*, 576 U.S. 257, 276 (2015) (internal quotation marks and citations omitted).  Indeed, the Supreme Court has admonished that Congress has prohibited the federal courts from "disturbing state-court judgments on federal habeas review absent an error that lies 'beyond any possibility for fairminded disagreement.'" *Mays v. Hines*, ___ U.S. ___, 141 S. Ct. 1145, 1146 (2021) (per curiam) (quoting *Shinn v. Kayer*, 592 U.S. ___, ___, 141 S. Ct. 517, 520 (2020) (per curiam) (some internal quotations omitted).

In *Nicolas v. Atty. Gen. of Maryland*, 820 F.3d 124, 129 (4th Cir. 2016), the Fourth Circuit explained (citing 28 U.S.C. § 2294(d)):

> The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a federal court reviewing a habeas petition that has already been adjudicated on the merits in state court to give considerable deference to the state court decision. A federal court may not grant habeas relief unless the state court arrived at "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Put another way, the standard requires the federal court to give a state-court decision "'the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citation omitted); *see also White v Woodall*, 572 U.S. 415, 419-20 (2014) (state prisoner must show state court ruling on claim presented in federal court was "'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded

disagreement.'") (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  Indeed, the habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see Bennett v. Stirling*, 842 F.3d 319, 322 (4th Cir. 2016); *Nicholas*, 820 F.3d at 129; *see also Harrington*, 562 U.S. at 100-01; 28 U.S.C. § 2254(e)(1).

"Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part."  *Sharpe v. Bell,* 593 F.3d 372, 378 (4th Cir. 2010).  This is especially true where the state court has "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)."  *Id.*  Moreover, this court "evaluate[s] the last reasoned state court decisions . . . ."  *Nicolas*, 820 F.3d at 129.

In sum, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see Barnes v. Joyner*, 751 F.3d 229, 238 (4th Cir. 2014); *Lovitt v. True*, 403 F.3d 171, 178 (4th Cir. 2005).

Notably, "'a federal habeas court may not issue the writ simply because [the court] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly.'" *Lovitt*, 403 F.3d at 178 (quoting *Williams*, 529 U.S. at 411). Rather, the state court's application of federal law must be unreasonable, not merely incorrect. *Nicolas*, 820 F.3d at 129; *see Harrington*, 562 U.S. at 100-01; 28 U.S.C. § 2254(e)(1). A factual determination is unreasonable when it is "'sufficiently against the weight of the evidence.'" *Walters*, 2021 WL 5365095, at *6 (citations omitted); *see Barnes*, 751 F.3d at 238-39 (state court's decision is an unreasonable application of clearly established federal law when the state court identifies the correct governing principle but unreasonably applies that principle to the facts).

Pursuant to the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "*an unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 365 (emphasis in *Williams); see also James v. Harrison,* 389 F.3d 450, 454 (4th Cir. 2004).

Notably, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see Burt v. Titlow*, 571 U.S. 12, 18 (2013). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question," a federal habeas court generally may not "supersede" the state court's decision as to a determination of the facts. *Wood*, 558 U.S. at 849 (citation omitted). In other words, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that

the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010).   Rather, as noted, the state court's factual determinations are presumed to be correct.   *Stirling*, 842 F.3d at 322.

### III.   Discussion

### A.   Ineffective Assistance of Counsel

The Sixth Amendment to the Constitution guarantees a criminal defendant the effective assistance of counsel.   *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, ____ U.S. ____, 137 S.Ct. 759, 775 (2017); *United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019).   Ineffective assistance of counsel is a well recognized basis for post-conviction relief.   *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687-88.   *See Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017).   First, the petitioner must show that counsel's performance was deficient.   Second, the petitioner must show that he was prejudiced by the deficient performance.   *Strickland*, 466 U.S. at 687; *see Buck*, 137 S. Ct. at 775; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013).

The first prong is known as the "performance prong," which relates to professional competence.  The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Richter,* 562 U.S. at 104; *Powell,* 850 F.3d at 149. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter,* 562 U.S. at 88 (quoting *Strickland,* 466 U.S. at 690).

The Supreme Court has made clear that the "first prong sets a high bar." *Buck,* 137 S. Ct. at 775; *see also Powell,* 850 F.3d at 149.  In *Padilla,* 559 U.S. at 371, the Court said: "Surmounting *Strickland's* high bar is never an easy task."  Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck,* 137 S.Ct. at 775 (citation omitted).  Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker,* 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison,* 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter,* 562 U.S. at 88 (quoting *Strickland,* 466 U.S. at 687).  Notably, "the *Strickland* standard must be applied with scrupulous care," *Richter,* 562 U.S. at 105, and "the standard of judging counsel's representation is a most deferential one." *Id.*  Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence,* 517 F.3d at 708 (quoting

*Strickland*, 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

### B.      Failure to Produce Promised Witness

Walker asserts that the post-conviction court erred in its analysis of his claim by focusing on trial counsel's decision not to call Mr. Staley as a witness on the last day of the trial. In Walker's view, the error in trial counsel's performance occurred when he failed to investigate the propriety of calling Mr. Staley as a witness *before* he made his opening statement to the jury, in which he

indicated that Staley would testify and exonerate Walker as the shooter.  In Walker's view, his lawyer breached a serious promise to the jury.  ECF at 5-6.

According to Walker, defense counsel knew there would be a problem with calling Mr. Staley as a witness but, due to a lack of investigation, he made the statement anyway.  ECF 1 at 2. He reasons that Mr. Staley's prior inconsistent statement to the police was available to trial counsel before he made his promise to the jury and he should have investigated it before trial.  ECF 1 at 2-3.  Further, Walker posits that the post-conviction court did not address the issue of counsel's failure to investigate Mr. Staley's testimony while nevertheless promising the jury that Mr. Staley would testify that Walker did not shoot him.  ECF 1 at 3.  Walker asserts: "That failure may have affected the outcome of the trial, especially given that the evidence of guilt was not overwhelming."  *Id*.

Walker argues that the failure to produce Mr. Staley as a witness for the defense harmed his case because "Staley's unexplained failure to take the witness stand may have conveyed to the jury that there was no testimony exonerating the defendant."  ECF 1 at 4-5.  The State's version of events was made more credible by comparison because the State presented all the testimony it promised.  *Id*. at 5.  Further, he argues that the post-conviction court erred in relying on *United States v. McGill*, 11 F.3d 223 (1st Cir. 1993), because counsel in *McGill* did not know about the witness's vulnerabilities until after the testimony was promised to the jury during opening statements.  ECF 1 at 5.  In contrast, counsel here knew about Staley's prior inconsistent statements to the police before trial, while trial counsel in *McGill* managed to present the same evidence through different avenues.  And, Walker takes issue with the characterization of the evidence against him as overwhelming, citing a jury note sent to the judge during deliberations stating they were unable to reach a verdict.  *Id*. at 6.

Walker's trial counsel testified at the post-conviction hearing that the impetus behind counsel's initial decision to call Corey Staley to testify in the defense's case in chief was Walker's assurance that Staley would testify that he knew who shot him and it was not Walker.  ECF 6-8 at 35.  Counsel recalled that Staley told him during phone interviews before trial that "he was facing the person who shot him and that while he wouldn't tell [counsel] who it was, he was insistent it was not Donnell Walker."  *Id.* at 37.  Further, he recalled that Staley did not "make an exoneration of Mr. Walker until talking to [defense counsel] and [he] wanted to get something [in writing] in case [Staley] flipped on [him] in trial."  *Id.*  Defense counsel could not get Staley to meet with him in person and recalled that Staley controlled the phone conversations.  *Id.*  Counsel described Staley as "dodgy," explaining that he would not give counsel "any good reason why . . . he hadn't come to Mr. Walker's defense instantly."  *Id.* at 38.

Even though counsel had reservations regarding Staley, he explained that "Mr. Walker absolutely wanted Mr. Staley to testify" and that "you don't always know what's going to happen" so "[y]ou have to try to go with the best you have."  *Id.* at 39.  Counsel further recalled that when he made his opening statement and mentioned Mr. Staley he was "holding his breath but expecting that Mr. Staley would come in, be ready, [and] testify."  *Id.* at 39-40.  Counsel explained he was "holding his breath" because he did not have a signed summons ensuring Staley's presence at trial. *Id.* at 40.[5]

With regard to defense counsel's ultimate decision not to attempt to recall Staley, counsel explained that the trial judge had excused the jury and closed out the evidence moments prior to

---

[5] Trial counsel explained he did not have a signed summons because he "couldn't get one." ECF 6-8 at 39.  Counsel repeatedly stated that Staley would not meet him in person or provide a written statement and that it was his experience that alibi witnesses were generally more cooperative and more willing to meet with defense counsel.  *Id.* at 40.

Staley arriving to testify.  ECF 6-8 at 43.  The court left open the opportunity to call Staley the following day but cautioned that counsel would need to provide legal argument allowing him to do so.  Counsel recalled that in the evening after that particular day in court he was "pretty drained" and, in addition to attempting to locate legal precedent allowing for Staley's testimony, he had to prepare for closing argument if Staley were not going to be allowed to testify.  *Id.*

Counsel said he understood why the court closed out his case, as the judge was "frustrated and aggravated with Mr. Staley's showing up at the last second."  *Id.*  Counsel could not recall for certain whether the jurors had been present for all of the delay caused by Staley's failure to appear for court in a timely manner but was fairly certain they had been.  *Id.*  Counsel added that he could not find any precedent stating that a judge lacks authority to close the evidence in a case and explained he began to feel very uncomfortable with what Staley would say if he were allowed to testify.  *Id.* at 43, 44.  He added, ECF 6-8 at 45:

> [A]s far as like how whatever he was going to say was going to come off, I was losing my confidence and I just personally do not like putting on witnesses that I don't have any confidence and comfort level with the questions I'm asking and the answers I'm going to get.  I did – I do remember talking with Mr. Walker about whether to proceed with trying to get Mr. Staley on or not with just some kind of general appeal to the Court to just, you know, come on, Judge, he – let him testify.  And I don't have any recollection at all of Mr. Walker being in disagreement at that point that we – I felt that we had a strong witness in the sister.  I thought that the two identifying witnesses had their own problems.  The guy in the wheelchair was running around looking for money and the woman in the house had distance factors and there was any number – and then, you know, just there wasn't anything forensic particularly at the scene.  So I felt that it wasn't really all that rock solid a case, necessarily, at that point and I was kind of leery about adding a real unpredictable factor at that point.

Moreover, defense counsel maintained that "the State had the ability to rip him [*i.e.*, Staley] up on cross with his original statement."  *Id.*  Further, counsel believed the strongest alibi witness who testified for Walker was his sister, Blair Walker.  *Id.* at 39.  During cross-examination and

after review of a portion of the trial transcript, counsel admitted that Staley was not present in the

court on the last day of trial. *Id*. at 47-48.

The post-conviction court found, in pertinent part, ECF 6-1 at 211-12:

> Trial Counsel indicated that at the time Trial Counsel gave his opening
> statement, on Wednesday July 27, 2016, Trial Counsel believed that Mr. Staley
> would testify in favor of [Walker] when the time came to present the defense,
> on Thursday July 28, 2019. [Walker's] trial counsel then testified that he lost
> confidence that Mr. Staley would testify that his testimony would be helpful to
> the defense, and that he felt confident in the defense since [Walker] had two alibi
> witnesses who he believes gave strong testimony in favor of [Walker]. For these
> reasons, Trial Counsel's decision to not call Mr. Staley strikes this court as a
> strategic decision in the heat of trial, deserving of the court's deference.

Again, Walker takes issue with counsel's risky decision to mention Mr. Staley in his

opening statement, and asserts that the post-conviction court's decision did not address this alleged

deficiency. However, the post-conviction court's decision includes a finding of fact that counsel

believed Staley would provide favorable testimony at the time of opening statements, based on

assurances that Walker and Staley provided to him. ECF 6-8 at 34, 35, 38-39. In hindsight, the

decision to mention Mr. Staley in opening statement appears to have been ill-advised. But, trial

counsel did not have the benefit of hindsight when he made his opening statement, nor could he

have known that Staley would fail to arrive on time to testify for Walker. In fact, trial counsel had

assurances from both Walker and Staley that Staley would testify at trial and exonerate Walker.

As the facts developed during trial, Staley's tardiness caused a delay in the proceedings,

inconveniencing the court and the jury. Counsel had to reconsider the wisdom of placing Staley

on the stand. The effect of that delay on the jury's potential view of Staley as a credible witness,

coupled with the prior inconsistent statement he provided to police, was justifiable cause for

counsel's concern later in the trial.

In his reply, Walker focuses on counsel's seeming reliance on assurances provided to him by both Walker and Staley that Staley would testify favorably.  ECF 9 at 3.  Walker states: "Defense counsel completely disregarded the traditional Attorney-Client relationship once he made the, so called, strategic decision to not only allow his incarcerated client to produce the most important eyewitness of this case, but also promise that witness testimony to the jury without having the slightest idea of how successful those attempts were."  *Id*. at 4.

Walker compares his case to *Bell v. Georgia*, 554 F.2d 1360 (5th Cir.1979).  However, the facts in *Bell* are quite different from Walker's case.  In *Bell*, trial counsel was found to have rendered ineffective assistance of counsel because counsel relied on his incarcerated client to contact alibi witnesses.  *Id*.  In Walker's case, trial counsel contacted all of the alibi witnesses, including Staley, who indicated he was willing to testify.  There was no failure to exercise due diligence as was the case in *Bell*.

As mentioned, Walker contends that the post-conviction court improperly relied on *United States v. McGill*, 11 F.3d 223, to support its conclusion that a failure to call a witness promised during opening statement is not always the mark of ineffective assistance of counsel.  I am not persuaded.  In *McGill*, the First Circuit simply observed that the inquiry is a fact-based one, defying the formulation of a hard and fast rule.  *Id*. at 227.  The expert testimony promised by McGill's counsel was elicited through cross-examination of the prosecution's expert.  *Id*. at 228.  Here, Walker's alibi defense was presented through the testimony of two other witnesses, neither of whom had made a prior inconsistent statement to the police.  The post-conviction court's analysis, concluding that trial counsel's performance did not fall below an acceptable standard, is supported by the record, is entitled to deference, and will be left undisturbed by this court.

Walker's argument that counsel's failure to produce a promised witness prejudiced the outcome of trial is also without merit.  Walker insists that Staley's failure to appear for trial was foreseeable from the outset, given that trial counsel admitted that Staley had refused to meet with him in person.  ECF 9 at 4-5 (citing *Magill v. Dugger*, 824 F.2d 879, 886 (11th Cir. 1987) (finding deficient performance of trial counsel during guilt phase of capital murder trial when counsel met with defendant for 15 minutes prior to his direct testimony and failed to advise that State would seek to prove premeditation during cross examination)).  In Walker's view, the jury's perception of Staley's character, after waiting for a considerable amount of time for him to appear, had a negative impact on the defense generally.  ECF 9 at 8.  He states that "[i]n an ordinary circumstance the jury may have brushed their irritation off only charging it against the witness" but here, there was also a broken promise to produce the witness.  *Id*.

Walker believes that the jury's lengthy deliberations and their note that they could not reach a unanimous verdict is evidence that he was prejudiced by trial counsel's broken promise to produce Staley.  ECF 9 at 8.  The fact that the jurors sent a note during deliberations, indicating they could not reach a verdict, does not by itself establish that the case against Walker was thin. The State produced two eyewitnesses to the shooting as well as other evidence implicating Walker. There is nothing on the record to indicate what the jury could not agree on or why.

In the end, the jury convicted Walker of the most serious charges related to Gwaltney's death.  But, it acquitted him of most of the charges as they related to the shooting of Staley.  This certainly suggests that the defendant benefitted from Staley's failure to appear.  Conversely, it was the prosecution that was prejudiced by the failure of the defendant to put Staley on the stand.

Walker has failed to establish he is entitled to federal habeas relief and his Petition shall be denied.

### C.      Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Because the accompanying Order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability before an appeal can proceed.

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When a petition is denied on procedural grounds, the petitioner may meet the standard by showing that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling."  *Id.*

Walker has failed to satisfy this standard.  Therefore, a certificate of appealability shall not issue.

### D.      Conclusion

For the foregoing reasons, the court will deny Walker's petition for writ of habeas corpus. I decline to issue a certificate of appealability.  A separate Order follows.


 November 23, 2021                                      /s/
Date                                           Ellen L. Hollander
                                               United States District Judge

22